# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

FRED DERRICK RUTLEDGE,

        Defendant-Appellant.

UNPUBLISHED
February 28, 2017

No. 330246
Kent Circuit Court
LC No. 14-005629-FC

Before: BORRELLO, P.J., and MARKEY and M. J. KELLY, JJ.

PER CURIAM.

Defendant appeals as of right his jury trial conviction of assault by strangulation, MCL 750.84(1)(b).[1] The trial court sentenced defendant as a fourth-offense habitual offender, MCL 769.12, to 11 to 25 years' imprisonment. For the reasons set forth in this opinion, we affirm.

## I. BACKGROUND

This case arises out of two incidents that occurred on June 2, 2014 in Spencer Township, Michigan. At that time, defendant and the victim, Jeanelle Rutledge, had been divorced for two years after 17 years of marriage. Defendant, Jeanelle, and their sons—Christian, 18, and Frederrick, 15—lived together.

At trial, Jeanelle testified that, on June 2, 2014, while defendant was at work, she and defendant began arguing via phone concerning text messages that she had sent to another man. When defendant arrived home from work, he was "pretty livid." According to Jeanelle, defendant told her "he was going to kill [her]" and "[t]hat if [she] didn't stay away from him, he was going to beat the crap out of [her]." Jeanelle testified that, later in the evening, while she was sitting on the couch in their living room, defendant walked over to her and "started choking [her]." She testified that she could not breathe or scream. Defendant told her he was going to kill her while he was choking her. According to Jeanelle, the event lasted five or six seconds,

---

[1] Defendant was also charged with assault with intent to commit murder, MCL 750.83, but the jury was unable to come to a unanimous decision on this count.

-1-

and defendant stopped choking her only when Christian and Frederrick walked into the room and yelled at defendant to stop.

Jeanelle testified that, following the children's intervention, defendant left the home and Jeanelle began to pack her possessions, intending to move out of the home. Afterward, she went into the kitchen to begin cooking dinner for the children. Defendant returned home with a bottle of peppermint schnapps and smelled like alcohol. Jeanelle testified that defendant entered the kitchen and asked if the children were home. When she responded that she did not know, "he proceeded to, once again, start choking" her. Jeanelle testified that she was able to scream once before the choking impeded her breathing and that defendant told her multiple times while choking her that "he was going to kill [her]." According to Jeanelle, defendant released her when Frederrick entered the room and yelled for defendant to stop. Jeanelle testified that Frederrick called the police, and defendant left the home, taking a 12- to 14-inch knife with him when he did so. As to her injuries, Jeanelle testified that there was some bruising on her neck and blood on her shirt and that her throat was sore for a week. Although she was not positive how the injury occurred, she believed the blood on her shirt was from her nose. Jeanelle testified that, although defendant had physically assaulted her on previous occasions, defendant had never previously tried to kill or strangle her.

Christian testified that he witnessed the first choking incident. After hearing yelling coming from the living room, he entered the room to see defendant choking Jeanelle. He left the room to get Frederrick, returned with Frederrick, and then the two yelled at defendant to stop. During the choking, he heard defendant say "Mark my words, your fat ass is going to be dead." Afterward, Jeanelle cried and defendant left the home. Christian testified that he left the home to call the police via public Wi-Fi. When Christian returned to the home, he saw defendant choking Jeanelle again in the kitchen. At trial, Christian did not recall telling police officers that he did not see the second incident and that defendant offered him $20 to choke Jeanelle.

Frederrick's testimony at trial was largely consistent with Christian's. As to the first incident, his narrative only differed in that Frederrick testified that he did not say anything to defendant when Frederrick and Christian entered the living room. Frederrick testified that, later that day, he entered the kitchen after hearing more arguing. He saw Jeanelle's nose bleeding and, when he asked defendant what happened, defendant claimed Jeanelle hit herself. Frederrick testified that defendant left soon afterward and Frederrick then called the police because he was frightened for Jeanelle's life. Frederrick stated that defendant did not grab a knife on his way out.

Kent County Sheriff's Department (KCSD) Deputy, Warren Hansen, testified that he was dispatched to defendant's residence on June 2, 2014. Christian flagged him down from the roadway and told him that Jeanelle was badly hurt. According to Deputy Hansen, when he arrived at the residence, Jeanelle had a bloody nose, a swollen and bruising left eye, and pain in her neck where she had been choked. Hansen testified that emergency medical technicians examined Jeanelle, determined that she had an elevated heart rate, and treated her with oxygen. Hansen spoke to both children about the incident and noted that Frederrick was extremely emotional during their discussion.

The following morning, KCSD Deputy Mike Hopkins met with Jeanelle and took photos of her neck and face. On the same day, KCSD Deputy Jason Vandyke made contact with defendant. At trial, Vandyke testified that defendant did not have a knife in his possession when he made contact. Defendant did have a cell phone in his possession, which was later collected by KCSD Deputy William Marks and analyzed by KCSD Detective Marcus Glover. The following text messages from defendant to friends "Zeb" and "Barn Bob" were read at trial:

[T]o Zeb . . . 4:50 p.m., "It will be a miracle if I don't kill her . . . ."

[T]o Zeb . . . 8:26 p.m., "Not good, I had my hand around her neck, and the big got me. I am not happy. She has been using me a long time, suber [sic] slut, I would do her if I could, no shit, I have pure resentment."

[T]o Barn Bob . . . 9:27 p.m., "That piggies are asking me babba, I tried to strangle Jeanelle, and Freddy told on me."

[T]o Barn Bob . . . 10:08 p.m., "Where you at dumb dumb, f------ cops are after me, you want to put me away forever, I strangled that b----."

Defendant also texted Jeanelle various messages accusing her of cheating, stating that he hated her, calling her a "b----" and a "s---," and stating that he would no longer pay for her support or their home. Defendant also texted Christian and Frederrick asking whether the police were looking for him and stating that he would no longer be supporting them. Deputy Marks also introduced into evidence a phone call between defendant and Barnaby made by defendant while he was at the Kent County Jail wherein defendant stated that he did not remember the rest of the evening due to his alcohol consumption and that defendant had been charged with assault by strangulation because "[he] put [his] hands around her neck."

Defendant testified that when he initially came home from work on June 2, he had consumed a half pint of peppermint schnapps and at least three beers and was drunk. Although defendant admitted that he touched Jeanelle during their argument, defendant testified that he did not strangle her. According to defendant, he "put [his] hands on her shoulder, and [he] did touch her neck. And [he] shook her, but [he] never strangled Jeanelle." Defendant stated that he did tell Jeanelle he was going to or "ought to" kill her, but did not want to hurt her and did not intend to kill her. Defendant testified that Jeanelle could breathe during the incident and was talking to him when his hands were on her shoulders and neck. According to defendant, the children did not interrupt him. Defendant stopped of his own accord and left the home to get more alcohol.

Defendant testified that he and Jeanelle continued arguing upon his return to the home. He stated that he did not touch Jeanelle during this second argument and did not know how Jeanelle's nose became bloody. According to defendant, he ultimately left the home that evening because Frederrick came into the kitchen, saw Jeanelle's bloody nose, and told defendant he was going to call the police. As to the text messages, testified that he "was just talking angry." Defendant also implied that the word "strangulation" appeared in the text messages read at trial due to his phone's autocorrect feature, stating: "I don't even think I said [strangulation]. You know how they say in the text messes up, I think the text messed up on that one." Defendant

-3-

also testified that he abused Jeanelle and the children on previous occasions, but stated that he had never strangled or intended to kill any of them.

Defendant was charged and convicted as set forth above. This appeal ensued.

## II. ANALYSIS

On appeal, defendant argues that the trial court erred in admitting other-acts evidence that he mistreated the family's dogs. "The decision whether evidence is admissible is within the trial court's discretion and should only be reversed where there is a clear abuse of discretion." *People v Starr*, 457 Mich 490, 494; 577 NW2d 673 (1998). An abuse of discretion occurs when a trial court admits evidence that is inadmissible as a matter of law. *People v Bynum*, 496 Mich 610, 623; 852 NW2d 570 (2014). Because defendant did not object on the same basis in the lower court, we review this unpreserved evidentiary error for plain error affecting defendant's substantial rights. *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999).

At trial, the prosecutor elicited the following testimony from Jeanelle:

> *Q*. What happened to the dog? Did he ever threaten the dog?
>
> *A*. He had token [sic] a cord and wrapped the cord around my dog's paw and neck.
>
> *Q*. Did he ever tell you why?
>
> *A*. He said he was going to kill the—anything that I loved.
>
> *Q*. And did you stop him from doing that?
>
> *A*. Yes, I did.
>
> *Q*. And the dog was okay?
>
> *A*. Yes.

At trial, Frederrick testified that defendant had threatened the dogs, but he did not recall ever seeing a cord around either of the dogs. Defendant denied having placed any cords around one of the dogs or threatening either dog.

Defense counsel objected to the testimony on the basis of relevance. According to the prosecutor, the evidence "goes to the fact that he—his rage that night and what he does to this dog and what he tells her he's going to do." The trial court allowed the testimony, stating that "[i]t goes to weight, not admissibility. The jury will determine the weight or importance to give to the testimony."

Despite its relevancy, evidence of a person's character is generally not admissible to prove the propensity of a defendant to act accordingly. MRE 404(a). Michigan excludes such evidence for substantive purposes "to avoid the danger of conviction based upon a defendant's

history of other misconduct." *People v Golochowicz*, 413 Mich 298, 308; 319 NW2d 518 (1982). However, MRE 404(b) provides that evidence of other crimes, wrongs, or acts may be admissible for other purposes:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, scheme, plan, or system in doing an act, knowledge, identity, or absence of mistake or accident when the same is material, whether such other crimes, wrongs, or acts are contemporaneous with, or prior or subsequent to the conduct at issue in the case. [MRE 404(b)(1).]

For evidence of other acts to be admissible under MRE 404(b), the trial court needed to employ a three-prong test. For the evidence to be admissible it must be (1) offered for a proper purpose; (2) be relevant under MRE 402; and (3) not have a probative value substantially outweighed by its potential for unfair prejudice. *People v VanderVliet*, 444 Mich 52, 55; 508 NW2d 114 (1993).

Unfortunately, the trial court did not state on the record whether it employed the three-prong test in arriving at its conclusion that the evidence " . . . [g]oes to weight, not admissibility . . . ." Therefore we turn to the record to determine whether the challenged testimony was admissible.

We begin our analysis by an examination of the prosecutor's rationale for offering the testimony. Here, the record reveals that the prosecutor's rationale was at best confusing, and taken literally clearly offered for an improper purpose. The prosecutor stated that the testimony was introduced for the purpose of demonstrating "[defendant's] rage that night and what he does to this dog and what he tells her he's going to do." In the words of the prosecutor, the evidence was being offered for the sole purpose of proving the defendant's propensity to get angry and do harm to animal or human. This is clearly an improper purpose. Even if we to ascribe a motive far removed from the mind of the prosecutor, we cannot glean a purpose other than the challenged testimony was offered to show that defendant had a bad temper and that when his temper flared up he would commit other bad acts. In turn, evidence of his other bad acts was offered to prove that defendant committed the charged offense. Again, this was not a proper purpose under MRE 404(b) and accordingly, the evidence was clearly admitted in error.

However, the trial court's clear error in admitting this improper evidence does not end our analysis. We must next examine whether the trial court's error impacted the outcome of the proceeding. *Carines*, 460 Mich at 763-764. Review of the record in this matter reveals that the improper testimony was relatively brief. Further, and most significantly, there was overwhelming evidence of defendant's guilt including detailed testimony of the victim and the victim's two sons who witnessed a significant portion of the events on the night of the assault. In addition, text messages retrieved from defendant's phone corroborated the victim's testimony. Given the overwhelming amount of evidence of defendant's guilt, defendant cannot show that the brief testimony concerning the family's pets impacted the outcome of the proceeding. *Id*. Accordingly, defendant is not entitled to relief on this issue.

Next, defendant argues that the assistant prosecutor committed misconduct when he improperly elicited testimony from Deputy Hopkins. Specifically, at trial, the prosecutor asked Hopkins why he took photographs of the victim's face when he interviewed the victim the day after the incidents. Hopkins responded that he had been trained to do so in strangulation cases to look for redness in the eyes due to lack of oxygen. Defendant contends that the prosecutor committed misconduct in eliciting the testimony. The test for prosecutorial misconduct is whether a defendant was denied a fair and impartial trial. *People v Dobek*, 274 Mich App 58, 63; 732 NW2d 546 (2007).

A prosecutor's good-faith effort to admit evidence does not constitute prosecutorial error. *Id.* at 70. Where evidence is arguably admissible, a prosecutor has not engaged in bad-faith by obtaining or attempting to obtain its admission. *Id.* To succeed on a claim of prosecutorial misconduct, a defendant must show "some prejudice or a pattern of eliciting inadmissible testimony." *People v Watson*, 245 Mich App 572, 587-588; 629 NW2d 411 (2001) (quotation marks and citation omitted).

Defendant argues that Hopkins' testimony was barred by MRE 701, which provides:

If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences that are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based in scientific, technical, or other specialized knowledge within the scope of Rule 702.

In the present case, Hopkins' testimony was not improper. Hopkins explained why he took photographs of the victim's neck. Based on his training, Hopkins explained that it was standard procedure to look for signs of strangulation and he discussed what he believed to be some of the signs of strangulation. Hopkins' testimony was not opinion testimony that was based on scientific, technical or specialized knowledge that would require him to be qualified as an expert under MRE 702. Rather, Hopkins' briefly explained that it was standard procedure to look for signs of strangulation given the facts and circumstances of the victim's allegations. Hopkins testified only that "redness" can appear in the eyes after strangulation because of lack of oxygen, as opposed to a more technical and scientific explanation of the body's reaction to strangulation. However, Hopkins also admitted that the redness could have been caused by something striking the eye. Moreover, Hopkins' testimony was "helpful to a clear understanding of . . . the determination of the fact in issue," MRE 701, in that it explained the importance of the redness of the victim's eyes in the photographs as indicating that the victim's breathing may have been impeded, a necessary element of assault by strangulation, MCL 750.84(2). However, even if the evidence was inadmissible under MRE 701, because it "could be reasonably argued" that the testimony was admissible, defendant has not shown that the prosecutor acted in bad-faith in eliciting the testimony. See *Dobek*, 274 Mich App at 78-79 (noting that a prosecutor does not act in bad faith when there is a reasonable argument that testimony is admissible.). Absent a showing that the prosecutor acted in bad faith, defendant cannot show that the prosecutor committed misconduct in eliciting the testimony. *Id.*

Furthermore, even if we were to presume that the testimony was improperly elicited, defendant cannot show that it denied him a fair trial. A preserved error requires reversal only if the defendant establishes that it is more probable than not that the error was outcome determinative. *People v Knapp*, 244 Mich App 361, 378; 624 NW2d 227 (2001). "An error is deemed to have been 'outcome determinative' if it undermined the reliability of the verdict." *People v Elston*, 462 Mich 751, 766; 614 NW2d 595 (2000) (citations omitted). Here, Hopkins' testimony did not impact the outcome of the verdict where there was overwhelming evidence of defendant's guilt and where Hopkins admitted that the eye redness could have been caused by something other than choking. Defendant is not entitled to relief on this issue.

Additionally, defendant argues that the prosecutor elicited Hopkins' opinion on the guilt or innocence of defendant and improperly bolstered the victim's credibility. However, Hopkins did not express an opinion as to the guilt or innocence of defendant. Instead, Hopkins offered testimony about his observations of the victim. These observations did not improperly bolster the victim's credibility. Hopkins testified that he was trained to look for redness in the eyes, that he took photographs of the victim's eyes, and that the victim's eyes were red. Hopkins also admitted that the redness could have been caused by something other than choking. Hopkins did not comment upon the testimony of any other witness. Our review of the record fails to indicate any evidence that the prosecutor engaged in any form of during the direct examination of Hopkins. We therefore cannot find that defendant was denied a fair trial. *Id*.

Affirmed.

/s/ Stephen L. Borrello
/s/ Jane E. Markey
/s/ Michael J. Kelly

-7-