# Syllabus

Chief Justice:
Stephen J. Markman

Justices:
Brian K. Zahra
Bridget M. McCormack
David F. Viviano
Richard H. Bernstein
Joan L. Larsen
Kurtis T. Wilder

**This syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.**

Reporter of Decisions:
Kathryn L. Loomis

PEOPLE v DENSON

Docket No. 152916. Argued on application for leave to appeal April 12, 2017. Decided July 17, 2017.

Defendant, Tmando A. Denson, was convicted of assault with intent to do great bodily harm less than murder, MCL 750.84, after a jury trial in the Genesee Circuit Court. Defendant's conviction arose from a physical altercation that he had with 17-year-old Shamark Woodward II, who was dating defendant's 15-year-old daughter. At trial, the witnesses presented starkly different versions of the events, but testimony was consistent that defendant had discovered Woodward and defendant's daughter in her bedroom, partially undressed. Defendant claimed that, after hearing his daughter yell in protest, he entered the room to find Woodward forcing his hand down his daughter's pants. According to defendant, he pulled Woodward away from his daughter, and he and Woodward fought. In contrast, Woodward claimed that his actions with defendant's daughter were consensual and that defendant brutally assaulted him. The prosecution introduced photographs of Woodward's injuries, which included lacerations to his body. The prosecution also sought to admit evidence under MRE 404(b) of the facts underlying defendant's 2002 conviction of assault with intent to do great bodily harm less than murder, arguing that this other-acts evidence was admissible to rebut defendant's claims of self-defense and defense of others. Defendant's 2002 conviction arose from an incident in which, after a dispute over an alleged drug debt, defendant bashed in an individual's car window and then shot the individual, who was retreating into his house. Defense counsel objected to admission of this other-acts evidence, arguing that it was an impermissible attempt to use propensity evidence in violation of MRE 404(b). The trial court, Geoffrey L. Neithercut, J., ruled that the prosecution could discuss the facts underlying the prior conviction, but barred the prosecution from introducing evidence of the actual conviction unless defendant denied that the underlying facts occurred. Defendant appealed his conviction in the Court of Appeals, and the Court, MURRAY, P.J., and METER and OWENS, JJ., affirmed in an unpublished per curiam opinion issued October 1, 2015. Defendant sought leave to appeal in the Supreme Court, which ordered and heard oral argument on whether to grant the application or take other action. 500 Mich 892 (2016).

In an opinion by Justice BERNSTEIN, joined by Chief Justice MARKMAN and Justices ZAHRA, McCORMACK, VIVIANO, and LARSEN, the Supreme Court, in lieu of granting leave to appeal, *held*:

When the prosecution seeks to admit evidence of other acts under MRE 404(b), the prosecution must assert a proper noncharacter purpose for admitting the evidence and must demonstrate the logical relevance of the evidence to that purpose by showing its materiality and probative value. In this case, the prosecution claimed to offer the other-acts evidence to rebut defendant's claims of self-defense and defense of others, but the lower courts failed to closely scrutinize the logical relevance of the other-acts evidence. Evaluation of the logical relevance of the evidence revealed that the trial court erred by admitting the evidence because the other act was not strikingly similar to the charged offense and instead served solely to demonstrate defendant's propensity for violence, thereby violating MRE 404(b). Given the facts of the case, the error was not harmless because it undermined the reliability of the verdict, and the case was remanded for a new trial.

1. Under MRE 404(b) evidence of other crimes, wrongs, or acts is inadmissible to prove a propensity to commit such acts, but such evidence may be admissible for other nonpropensity purposes. The proponent of other-acts evidence must first articulate a proper noncharacter purpose for admission of the other-acts evidence. In this case, the prosecution claimed that the other-acts evidence was offered for the purpose of rebutting defendant's claims of self-defense and defense of others. These theories of admission are best understood as an attempt to rebut a defendant's state of mind, that is, to show that a defendant did not honestly and reasonably believe that the use of force was necessary to defend himself or herself or another person. However, merely reciting a proper purpose does not automatically render the evidence admissible; the prosecution must demonstrate the actual existence of a proper purpose by showing the logical relevance of the other-acts evidence at issue.

2. Other-acts evidence is logically relevant if two components are present: materiality and probative value. With respect to materiality, in this case, while the prosecution's burden to disprove defendant's claims of self-defense and defense of others placed these defenses generally at issue, the specific other-acts evidence offered was not material because it was not probative of these defenses. To be probative under MRE 404(b), the prosecution must not only articulate a proper purpose for the evidence, but must also explain how the evidence is relevant to that purpose without relying on a propensity inference. Ultimately, the court must determine whether the prosecution has established an intermediate inference, other than the improper inference of character, which in turn is probative of the ultimate issues in the case. If the prosecution's theory of relevance is based on the alleged similarity between a defendant's other act and the charged offense, there must be a striking similarity between the other act and the charged offense to find the other-acts evidence probative and admissible. In this case, the prosecution sought to admit the other-acts evidence particularly based on the alleged similarity between the 2002 incident and the charged offense. However, the prosecution failed to show striking similarity between the acts. The fact that defendant had previously assaulted a completely different individual in a completely different scenario years earlier had no probative force other than to demonstrate defendant's propensity for violence and that defendant acted consistently with that tendency in attacking Woodward. Therefore, the other-acts evidence was not probative of anything other than defendant's allegedly bad character and propensity to commit the charged offense, the very inference forbidden by MRE 404(b). Although the prosecution nominally recited what could be a proper purpose for admission of the other-acts evidence, evaluation of the probative value of the evidence revealed that no such purpose actually existed; the articulated purpose was merely a

front for the admission of improper other-acts evidence. The trial court and the Court of Appeals erred by failing to closely scrutinize the probative value of the other-acts evidence and by concluding that the other-acts evidence was admissible.

3. Under harmless-error review, a preserved nonconstitutional error is presumed not to be a ground for reversal unless it affirmatively appears more probable than not that the error was outcome determinative. An error is outcome determinative if it undermines the reliability of a verdict. The reviewing court must focus on the nature of the error and assess its effect in light of the weight and strength of the untainted evidence. The admission of improper other-acts evidence creates a severe risk that the jury will use the evidence precisely for the purpose that it may not be considered, that is, as suggesting that the defendant is a bad person and that if he did it before he probably did it again. In this case, defendant and Woodward gave very different accounts of the events in question. In addition to proving the elements of the crime charged, the prosecution was required to disprove defendant's claims of self-defense and defense of others. To do so, the prosecution needed the jury to believe that defendant had unjustifiably attacked Woodward. In pursuit of that objective, the prosecution questioned several defense witnesses about the 2002 incident in a manner that suggested that defendant was an aggressive and violent man and that Woodward was simply another victim of defendant's violent tendencies. Such use of the impermissible propensity inference prohibited by MRE 404(b), which the prosecution repeatedly made to the jury, created prejudice that entitled defendant to relief. The prosecution further compounded the problem in closing argument by remarking on defendant's allegedly violent nature. Although the prosecution also introduced photographs and medical testimony regarding Woodward's injuries, the mere presence of some corroborating evidence does not automatically render an error harmless. Defendant's version of the events was not wholly inconsistent with the injuries Woodward sustained. Given the nature of the error and assessing its effect in light of the weight and strength of the untainted evidence, the error was not harmless.

Reversed and remanded for a new trial.

Justice WILDER, dissenting, would have denied defendant's application for leave to appeal. Even if the other-acts evidence was improperly admitted under MRE 404(b), the error did not require reversal because defendant did not establish that it was more probable than not that he would have been acquitted were it not for the introduction of that evidence. By claiming self-defense and defense of others, defendant necessarily admitted the commission of the crime, but sought to excuse its commission. While defendant claimed the assault was justified in order to prevent his daughter from being sexually assaulted, the prosecution sought to prove that defendant's claim of attempted sexual assault was false, devised by defendant afterward in order to escape criminal responsibility for Woodward's assault. The evidence of Woodward's injuries did not support defendant's claims of self-defense. Woodward's most serious injuries, requiring 21 sutures and 8 staples to close, were located on the back and side of his body. Moreover, the post-altercation conduct of defendant and his family members was not remotely consistent with defendant's claim that his daughter had been the victim of an imminent sexual assault. Because there was more than ample evidence for the jury to conclude that the claim of an imminent sexual assault had been fabricated, defendant failed to establish entitlement to reversal of his conviction.

©2017 State of Michigan

# OPINION

Chief Justice:          Justices:
Stephen J. Markman      Brian K. Zahra
                        Bridget M. McCormack
                        David F. Viviano
                        Richard H. Bernstein
                        Joan L. Larsen
                        Kurtis T. Wilder

FILED July 17, 2017

STATE OF MICHIGAN

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v                             No. 152916

TMANDO ALLEN DENSON,

        Defendant-Appellant.

_____

BEFORE THE ENTIRE BENCH

BERNSTEIN, J.

In this case, we consider whether evidence of defendant's prior act was admissible under MRE 404(b) to rebut defendant's claims of self-defense and defense of others, that is, defendant's claim that he honestly and reasonably believed his use of force was necessary to defend himself or another. We hold that the trial court erred when it admitted defendant's prior act because the prosecution failed to establish that it was logically relevant to a proper noncharacter purpose. We also conclude that this error was

not harmless.  Accordingly, we reverse the judgment of the Court of Appeals and remand the case to the trial court for a new trial.

## I.  FACTS AND PROCEDURAL HISTORY

This case stems from a physical altercation between defendant Tmando Allen Denson and 17-year-old Shamark Woodward II on the evening of October 22, 2012.  As a result of this incident, defendant was charged with assault with intent to do great bodily harm less than murder, MCL 750.84.

At trial, Woodward and defendant presented very different accounts of what occurred on the night in question.  Testifying for the prosecution, Woodward explained that he had previously met defendant's 15-year-old daughter, DD, at school and the two started dating.  On the evening of October 22, DD invited Woodward to her house at a time when defendant and Rosemary Denson—defendant's wife and DD's mother—were not home.  Woodward and DD began talking and kissing on the couch in the living room.  When they heard a car outside, DD suggested that they go upstairs to her room, where the two continued to kiss.  Eventually, Woodward and DD removed their pants.  Woodward testified that he suddenly heard footsteps on the stairs and that defendant burst into the room, finding the two teenagers in this compromising position.  Defendant immediately attacked Woodward, punching and kicking him and then hitting him with a lamp.  Defendant then forced both teenagers to undress and took photographs of them.  Defendant left the room and returned with two knives.  Defendant instructed Woodward to sit in the corner and proceeded to slash Woodward repeatedly across his back, shoulders, and legs.  Woodward denied possessing a weapon during the attack, denied

2

fighting back against defendant, and denied sexually assaulting or threatening DD in any way.

Woodward further testified that when he arrived home, he told his brothers what had happened and was taken to the hospital, where he received numerous staples and stitches. Photographs of Woodward's injuries were admitted into evidence at defendant's jury trial. The photos showed two lacerations on Woodward's back and lacerations on his arm, shoulder, and leg. The attending doctor, Dr. Faisal Mawri, testified that Woodward reported being assaulted and that his multiple injuries were consistent with wounds inflicted by a sharp object. Woodward's mother and a police officer who spoke to Woodward at the hospital also confirmed the nature of Woodward's injuries.

Defendant testified in his own defense, presenting a starkly different version of the events. Defendant explained that, after arriving home from work, he went downstairs to the basement to watch a football game with his two sons. DD, he believed, was upstairs alone. All of a sudden, he heard a loud noise and immediately ran upstairs to investigate. He heard DD yell, "[N]o, stop," and "[W]hat are you doing, my daddy is downstairs." Defendant ran into DD's room, where he saw DD on the floor and Woodward leaning over her, trying to force his hand down her pants. Defendant admitted to physically striking Woodward. Woodward then broke loose and ran downstairs. Defendant followed Woodward downstairs, testifying that he was scared for his two sons, who were still in the basement. Defendant and Woodward met once more in the kitchen, where both individuals grabbed knives, and Woodward threw a glass at defendant, striking defendant's hand. Woodward then ran back upstairs where he and defendant threw their knives at each other. At some point, shortly thereafter, the fighting ceased and

3

Woodward left. Defendant denied taking pictures of the teenagers and denied using a knife in the manner Woodward alleged. Defendant claimed that he honestly believed that DD was being sexually assaulted and that he was protecting her and himself from Woodward.

Defendant further testified that he immediately called his parole officer to report the incident, but no one answered. He also went to the local police precinct but found that it was closed. Defendant told the jury that he suffered a broken finger, puncture wounds to his hand, and cuts on his arms. Although defendant sought to introduce jail medical records to further substantiate these injuries, the trial court barred their admission because defense counsel's effort to obtain the records was dilatory.

Several witnesses testified on defendant's behalf. Tmando Denson, Jr., one of defendant's sons, confirmed that he had been watching a game with defendant and that defendant left the basement after hearing a loud noise upstairs. DD also took the stand, largely corroborating defendant's account of the incident and asserting that Woodward had tried to sexually assault her. However, DD testified that she never saw defendant or Woodward with a knife. She also denied seeing any cuts on Woodward's body. Rosemary Denson testified that DD had called her that evening to tell her what had happened and that DD had received sexual assault counseling shortly afterward.

At trial, pursuant to MRE 404(b), the prosecution sought to admit the facts underlying defendant's prior 2002 conviction for assault with intent to do great bodily harm less than murder, MCL 750.84.[1] This prior conviction arose from an unrelated

---

[1] Before trial, the prosecution had filed notice under MRE 404(b), indicating its intent to admit the facts underlying the 2002 conviction "[f]or the purpose of proving absence of

4

incident involving an unrelated individual named Tyrone Bush. Apparently, after becoming upset with Bush over a supposed drug debt, defendant had driven to Bush's home in Detroit, bashed in his car window, and shot Bush when he appeared on his porch and turned to retreat back inside his home. Defense counsel objected to the admission of any evidence related to the 2002 incident, arguing that it was an impermissible attempt to use propensity evidence in violation of MRE 404(b). Citing this Court's decision in *People v VanderVliet*, 444 Mich 52; 508 NW2d 114 (1993), defense counsel argued that the 2002 incident was irrelevant, unfairly prejudicial, and offered for the improper purpose of showing that defendant had acted in conformity with his allegedly violent character. The prosecution responded that admission of the facts underlying the 2002 conviction did not violate MRE 404(b) because the evidence was not being offered to show propensity, but rather to rebut defendant's claims of self-defense and defense of others. The trial court ruled that the prosecution could discuss the facts underlying the conviction, but it barred the prosecution from introducing evidence concerning the actual conviction unless defendant denied that the underlying facts occurred.

The prosecution subsequently elicited evidence of the 2002 incident from several defense witnesses. The prosecutor asked defendant whether the specific facts of the 2002 incident were true. The prosecutor then suggested to defendant, "You have a bad temper, don't you?" Later, the prosecutor asked defendant to admit that beating Woodward got the "rage out of your system, because you are a bully . . . , aren't you? Yes or no?"

---

self-defense or defense of others, absence of mistake, modus operandi, scheme[,] plan and knowledge." See MRE 404(b)(2).

5

The prosecutor also brought up defendant's alleged temper when questioning members of defendant's family. In cross-examining DD, the prosecutor informed her that he was going to inquire "a little bit about your family history." The prosecutor then asked if DD was aware that defendant had previously gotten into trouble for losing his temper and shooting someone. Driving the point home, the prosecutor continued, "[Y]ou wouldn't want your dad to lose control with you like he lost control with [Woodward]." In contrast, the prosecutor sought to confirm with DD that Woodward was "a nice boy." Turning to Rosemary Denson, the prosecutor asked Rosemary whether she was aware of the "family history" involving the 2002 incident and whether defendant's bad temper and loss of control caused her to fear defendant. The prosecutor also brought up the 2002 incident when questioning DD's sexual assault crisis counselor, Christina Delikta. The prosecutor asked whether defendant had told her about the 2002 incident in which he had "gotten into trouble in the past for assaulting somebody in Detroit." Defense counsel repeatedly, but unsuccessfully, objected to the questions posed to all four defense witnesses, at one point moving for a mistrial, which the trial court denied.[2]

The prosecution returned to the 2002 incident in closing argument. Addressing defendant directly, the prosecutor stated:

> And you know, we have no reasonable doubt; no doubt that's fair that there was any kind of defense of anybody. This was just a savage

---

[2] Additionally, when the trial court solicited witness questions from the jury, one juror sought to inquire of a police witness, "[D]o you think Mr. Denson is a violent person, or can be a violent person or have a bad temper[?]" The trial court did not permit this question to be asked.

6

beating, Mr. Denson. You lost control, just like you did in Detroit when you shot that guy. You're a bully, Mr. Denson and you're a coward. . . .

\* \* \*

. . . Cause you have Mr. Denson intending to cause great bodily harm to just a boy.

In comparison, the prosecutor assured the jury that Woodward was "a good guy." And in rebuttal, the prosecutor again argued:

The [2002] incident in Detroit. Hey, not a coincidence, okay. Not a coincident [sic] that the bully over a $75 . . . drug debt takes his gun, bashes the car window and shoots the guy while he's retreating into the house. No self defense in that circumstance.

\* \* \*

. . . And um, this guy pounded on [Woodward] with his hands, pounded on [Woodward] with his feet, kicking [Woodward] in the face, trying to wack [sic] him with the chair, bashing a lamp over his head and breaking it. . . . Then taking photos so he would have some evidence. . . . They're not coincidences. No self defense.

The trial court gave self-defense and defense-of-others instructions to the jury. Ultimately, the jury convicted defendant of assault with intent to do great bodily harm less than murder, and defendant was sentenced as a fourth-offense habitual offender to a prison term of 5 to 20 years.

On appeal, defendant argued that the trial court had erred by admitting under MRE 404(b) the evidence related to the 2002 incident. The Court of Appeals rejected this claim and affirmed defendant's conviction. *People v Denson*, unpublished per curiam opinion of the Court of Appeals, issued October 1, 2015 (Docket No. 321200). Specifically, the Court of Appeals believed that "[t]he contradiction of [defendant's] self-defense theory constituted a proper, noncharacter purpose for admission under MRE

7

404(b)." *Id*. at 5. Further, while the Court of Appeals acknowledged that the evidence was somewhat prejudicial to defendant, the panel concluded that there was no danger of unfair prejudice, confusion of the issues, or misleading the jury. *Id*.

In this Court, defendant has again raised a challenge under MRE 404(b). We scheduled oral argument on the application.[3]

## II. STANDARD OF REVIEW

A trial court's decision to admit evidence will not be disturbed absent an abuse of discretion. *People v Mardlin*, 487 Mich 609, 614; 790 NW2d 607 (2010). However, whether a rule or statute precludes admission of evidence is a preliminary question of law that this Court reviews de novo. *Id*. A trial court necessarily abuses its discretion when it admits evidence that is inadmissible as a matter of law. *People v Lukity*, 460 Mich 484, 488; 596 NW2d 607 (1999).

When we find error in the admission of evidence, a preserved nonconstitutional error "is presumed not to be a ground for reversal unless it affirmatively appears that, more probably than not, it was outcome determinative—i.e., that it undermined the reliability of the verdict." *People v Douglas*, 496 Mich 557, 565-566; 852 NW2d 587 (2014) (quotation marks and citations omitted); *Lukity*, 460 Mich at 495-496.[4] This

---

[3] In his application in this Court, defendant raised several additional claims and requested a remand for an evidentiary hearing pursuant to *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973). Because we grant defendant a new trial on the basis of his MRE 404(b) challenge, we decline to address those other issues and deny the motion to remand for a *Ginther* hearing.

[4] Defendant preserved his MRE 404(b) challenge by objecting to the admission of the other-acts evidence in the trial court.

inquiry "focuses on the nature of the error and assesses its effect in light of the weight and strength of the untainted evidence." *Lukity*, 460 Mich at 495 (quotation marks and citation omitted). "In other words, the effect of the error is evaluated by assessing it in the context of the untainted evidence to determine whether it is more probable than not that a different outcome would have resulted without the error." *Id*.

### III.  MRE 404(b)

MRE 404 governs the admissibility of other-acts evidence. The general rule under MRE 404(b) is that evidence of other crimes, wrongs, or acts is inadmissible to prove a propensity to commit such acts. *People v Crawford*, 458 Mich 376, 383; 582 NW2d 785 (1998). Such evidence may, however, be admissible for other purposes under MRE 404(b)(1), which provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, scheme, plan, or system in doing an act, knowledge, identity, or absence of mistake or accident when the same is material, whether such other crimes, wrongs, or acts are contemporaneous with, or prior or subsequent to the conduct at issue in the case.

The first sentence of this rule represents the deeply rooted and unwavering principle that other-acts evidence is inadmissible for propensity purposes. *People v Sabin (After Remand)*, 463 Mich 43, 56; 614 NW2d 888 (2000); *Crawford*, 458 Mich at 383. Far from "a mere technicality," this prohibition "gives meaning to the central precept of our system of criminal justice, the presumption of innocence." *Crawford*, 458 Mich at 383-384 (quotation marks and citation omitted). This rule reflects the fear that a jury will convict a defendant on the basis of his or her allegedly bad character rather than because

9

he or she is guilty beyond a reasonable doubt of the crimes charged. *Id*. at 384. Indeed, the very danger of other-acts evidence "is not that it is irrelevant, but, to the contrary, that using bad acts evidence can weigh too much with the jury and . . . so overpersuade them as to prejudge one with a bad general record and deny him a fair opportunity to defend against a particular charge." *Id*. (quotation marks and citation omitted). Woven inextricably into the fabric of our jurisprudence is the principle that "we try cases, rather than persons . . . ." *People v Allen*, 429 Mich 558, 566; 420 NW2d 499 (1988). The second sentence of MRE 404(b)(1) establishes that other-acts evidence may be admissible for other nonpropensity purposes. *Sabin*, 463 Mich at 56; *Crawford*, 458 Mich at 390 n 8.

In *VanderVliet*, this Court articulated the following standard for the admission of other-acts evidence:

> First, that the evidence be offered for a proper purpose under Rule 404(b); second, that it be relevant under Rule 402 as enforced through Rule 104(b); third, that the probative value of the evidence is not substantially outweighed by unfair prejudice; fourth, that the trial court may, upon request, provide a limiting instruction to the jury. [*VanderVliet*, 444 Mich at 55.]

## A. PROPER PURPOSE

Under the first prong of the *VanderVliet* test, the question is whether the prosecution has articulated a proper noncharacter purpose for admission of the other-acts evidence. *Crawford*, 458 Mich at 385-386. The prosecution bears the burden of establishing that purpose. *Id*. at 385. MRE 404(b) prohibits the admission of other-acts evidence when the prosecution's only theory of relevance is that the other act demonstrates the defendant's inclination for wrongdoing in general and thus indicates

10

that the defendant committed the conduct in question. *People v Starr*, 457 Mich 490, 496; 577 NW2d 673 (1998), citing *VanderVliet*, 444 Mich at 63. On the other hand, such other-acts evidence may be admissible whenever it is also relevant to a noncharacter purpose, such as one of the purposes specifically enumerated in MRE 404(b)(1). *Starr*, 457 Mich at 496-497.

In the instant case, defendant presented testimony from several witnesses to show that he honestly and reasonably believed that his use of force was necessary to defend himself and his family. See MCL 780.972(2). Once defendant presented a prima facie claim of self-defense or defense of others, the prosecution bore the burden of disproving the claim beyond a reasonable doubt. See *People v Dupree*, 486 Mich 693, 709-710; 788 NW2d 399 (2010). In the instant case, the prosecution claimed that it offered evidence of the 2002 incident to rebut defendant's claims of self-defense and defense of others.[5] Other courts have recognized these theories of admission,[6] and they are best understood as an attempt to rebut a defendant's claimed state of mind, that is, to show that a

---

[5] We note that the prosecution listed several additional possible purposes in its MRE 404(b) pretrial notice, specifically absence of mistake, modus operandi, scheme, plan, and knowledge. However, at trial, the prosecution did not offer these purposes as a basis for admission of the other-acts evidence. We have previously criticized such a "shotgun" approach, *People v Golochowicz*, 413 Mich 298, 314-315; 319 NW2d 518 (1982), and we now reiterate that the prosecution must articulate its evidential hypothesis with precision and "the trial court must identify specifically the purpose for which the evidence is admitted[.]" *Crawford*, 458 Mich at 386 n 6 (quotation marks and citation omitted).

[6] See, e.g., *Yusem v People*, 210 P3d 458, 465 (Colo, 2009); *State v Payano*, 320 Wis 2d 348, 389; 768 NW2d 832 (2009); *United States v Haukaas*, 172 F3d 542, 544 (CA 8, 1999).

11

defendant did not have an honest and reasonable belief that his or her use of force was necessary to defend himself or herself or another. See *State v Dukette*, 145 NH 226, 230; 761 A2d 442 (2000) ("By filing a notice of self-defense, the defendant has placed her state of mind at issue.").

However, we have warned that "a common pitfall in MRE 404(b) cases" is that trial courts tend to admit other-acts evidence merely because the proponent has articulated a permissible purpose. *Crawford*, 458 Mich at 387. The "mechanical recitation" of a permissible purpose, "without explaining how the evidence relates to the recited purpose[], is insufficient to justify admission under MRE 404(b)." *Id*. It is incumbent on a trial court to "vigilantly weed out character evidence that is disguised as something else." *Id*. at 388. In other words, merely *reciting* a proper purpose does not actually demonstrate the *existence* of a proper purpose for the particular other-acts evidence at issue and does not automatically render the evidence admissible. Rather, in order to determine whether an articulated purpose is, in fact, merely a front for the improper admission of other-acts evidence, the trial court must closely scrutinize the logical relevance of the evidence under the second prong of the *VanderVliet* test. *Id*.; *Sabin*, 463 Mich at 60.

## B. LOGICAL RELEVANCE

Under the second prong of the *VanderVliet* test, logical relevance is determined by the application of MRE 401[7] and MRE 402.[8] *Crawford*, 458 Mich at 388. We have

---

[7] MRE 401 provides:

emphasized the importance of logical relevance, calling it the "touchstone" of the admissibility of other-acts evidence. *Id.* Other-acts evidence is logically relevant if two components are present: materiality and probative value. *Id.*

## 1. MATERIALITY

Materiality is the requirement that the other-acts evidence be related to " 'any fact that is of consequence' " to the action. *Id.*, quoting MRE 401. "In other words, is the fact to be proven truly in issue?" *Crawford*, 458 Mich at 388 (quotation marks and citation omitted). The prosecution bears the burden of proving every element of a charged offense beyond a reasonable doubt. *Id.* at 389. At trial, defendant presented prima facie claims of self-defense and defense of others, and therefore the prosecution bore the burden of disproving the claims beyond a reasonable doubt. See *Dupree*, 486 Mich at 709-710. Because the prosecution was required to disprove defendant's claims of self-defense and defense of others, these defenses were generally at issue. However, because the specific other-acts evidence offered in this case was not probative of these defenses, the other-acts evidence itself was not material.

---

"Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

[8] MRE 402 provides:

All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, the Constitution of the State of Michigan, these rules, or other rules adopted by the Supreme Court. Evidence which is not relevant is not admissible.

13

## 2. PROBATIVE VALUE

The prosecution must demonstrate the probative value of the other-acts evidence. *Crawford*, 458 Mich at 389-390. In this case, the absence of probative value establishes the inadmissibility of the other-acts evidence under MRE 404(b).

Evidence is probative if it tends "to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." MRE 401; *Crawford*, 458 Mich at 389-390. Generally, "[t]he threshold is minimal: 'any' tendency is sufficient probative force." *Crawford*, 458 Mich at 390. "In the context of prior acts evidence, however, MRE 404(b) stands as a sentinel at the gate: the proffered evidence truly must be probative of something *other* than the defendant's propensity to commit the crime." *Id*. Thus, although the prosecution might claim a permissible purpose for the evidence under MRE 404(b), the prosecution must also *explain how* the evidence is relevant to that purpose without relying on a propensity inference. See *id*. Ultimately, the court must determine whether the prosecution has established "some intermediate inference, other than the improper inference of character, which in turn is probative of the ultimate issues in [the] case . . . ." *Crawford*, 458 Mich at 391. If not, the evidence is inadmissible. *Id*. at 390.

In evaluating whether the prosecution has provided an intermediate inference other than an impermissible character inference, we examine the similarity between a defendant's other act and the charged offense. *Id*. at 394-395. In this case, we note that the prosecution sought to admit the other-acts evidence *particularly* based on the alleged

14

similarities between the 2002 incident and the charged offense.[9]  The degree of similarity that is required between a defendant's other act and the charged offense depends on the manner in which the prosecution intends to use the other-acts evidence.  See *Mardlin*, 487 Mich at 616; *Crawford*, 458 Mich at 395 n 13; *VanderVliet*, 444 Mich at 67.  The *VanderVliet* Court explained:

> If we ask, does [the] misconduct have to exhibit striking similarity with the misconduct being investigated, the answer is, only if similarity is relied on.  Otherwise not.  There are only two classes of case[s,] [those in which similarity is relied on and those in which it is not], and they do not depend on the nature of the evidence, but on the nature of the argument. [*VanderVliet*, 444 Mich at 67 (quotation marks and citation omitted; alterations in original).]

This principle is clear.  If the prosecution creates a theory of relevance based on the alleged similarity between a defendant's other act and the charged offense, we require a "striking similarity" between the two acts to find the other act admissible.  *Id*.  When the prosecution's theory of relevancy is not based on the similarity between the other act and the charged offense, a "striking similarity" between the acts is not required.  *Id*.

In cases in which the prosecution has relied on similarity in seeking to admit other-acts evidence, this Court and other courts have frequently prohibited the admission of that evidence under MRE 404(b) due to the dissimilarity between the other acts and the charged offenses.  In *Crawford*, the prosecution introduced evidence of the

---

[9] The prosecutor told the jury that defendant violently assaulted Bush "just like" he violently assaulted Woodward.  The prosecutor further stated that defendant's acts in 2002—bashing a window and shooting Bush—were similar to defendant's acts in this case—striking Woodward and bashing him with a lamp.  And since there was no self-defense in the 2002 incident, there could be no self-defense here: "They're not coincidences.  No self defense."

defendant's prior drug conviction, emphasizing the similarity between the prior offense and the charged offense of possession with intent to deliver cocaine. *Crawford*, 458 Mich at 392-393. This Court found an "insufficient factual nexus" between the prior act and the charged offense to warrant admission. *Id*. at 395-396. The Court highlighted the distinct natures of the prior act and the charged offense; in the prior act involving the delivery of cocaine, the defendant had been caught in the act of selling drugs, a fact that was not present in the charged offense of possession. *Id*. at 396. The Court further explained:

> If, however, defendant's prior crime involved the concealment of drugs in the dashboard of his car, that evidence would likely be admissible under the doctrine of chances because of the stark similarity of the two crimes. There is, then, a continuum upon which each proffered prior act must be placed; the more similar the prior act to the charged crime, the closer the evidence to the admissibility threshold. [*Id*. at 395 n 13.]

Given the lack of similarity between the defendant's prior and charged offenses, the *Crawford* Court concluded that the prior conviction only demonstrated that the defendant was "the kind of person" who would distribute drugs and that the conviction was logically relevant solely by way of this forbidden intermediate inference of bad character. *Id*. at 397. Therefore, we ruled that the defendant's prior conviction was character evidence "masquerading" as evidence purportedly offered for a proper purpose and was inadmissible. *Id*.

In *People v Knox*, 469 Mich 502; 674 NW2d 366 (2004), to prove that the defendant had physically abused and murdered his infant son, the prosecution introduced evidence that the defendant had become angry with the child's mother in the past, and had physically abused her. *Id*. at 506. The Court considered whether the prior violent act

16

and the charged violent offense were "sufficiently similar" to render the prior act relevant under MRE 404(b), ultimately finding the prior act inadmissible. *Id*. at 512-515. The *Knox* Court noted that the prior act of violence and the charged offense were distinct in nature, emphasizing that the defendant's prior manifestations of anger towards the mother bore no resemblance to the acts determined to have caused the death of the child. *Id*. at 512. The Court also highlighted that the violent acts were committed against two different people. *Id*.

In *United States v Sanders*, 964 F2d 295, 298 (CA 4, 1992), the prosecution introduced, under FRE 404(b), evidence of the defendant's prior assault conviction to rebut the defendant's assertion of a self-defense claim to the charged assault offense.[10] The United States Court of Appeals for the Fourth Circuit found error requiring reversal. *Id*. at 299. The court noted that because the defendant had admitted to stabbing the complainant, the only factual issue was whether his claim of self-defense provided the reason for the stabbing. *Id*. at 298. The Fourth Circuit reasoned, "The fact that [the defendant] had committed an assault on another prisoner . . . had nothing to do with his reason for—his intent in—stabbing [the complainant]." *Id*. at 298-299. Although the prosecution was able to articulate a permissible purpose for admission—rebutting defendant's self-defense claim—the court concluded that there was no relevance to the prior assault conviction. *Id*. The evidence only established the defendant's propensity to

---

[10] "Because the Michigan Rules of Evidence in general parallel the text of the federal rules on which the state committee's product was based, we find helpful and, in some instances, persuasive, commentary and case law that refers to the Federal Rules of Evidence." *VanderVliet*, 444 Mich at 60 n 7.

commit assaults on other individuals or his general propensity to commit violent crimes, the exact kind of propensity evidence prohibited by FRE 404(b). *Id*. at 299.

In *United States v Commanche*, 577 F3d 1261, 1265 (CA 10, 2009), the trial court admitted testimony about the defendant's two prior assault convictions to rebut the defendant's self-defense claim. The United States Court of Appeals for the Tenth Circuit reversed, finding that the rebuttal of the defendant's self-defense claim using the prior assault convictions only served to establish "a chain of inferences dependent upon the conclusion that [the defendant] has violent tendencies and acted consistent with those tendencies during the fight." *Id*. at 1269. The court held that the evidence was inadmissible under FRE 404(b) because the other-acts evidence could not show that "[the defendant's] self-defense theory was invalid unless the jury impermissibly infer[red] that he acted in conformity with a violent predisposition . . . ." *Id*.

In this case, we conclude that the evidence of the 2002 incident was not probative of anything other than defendant's allegedly bad character and propensity to commit the charged offense. As noted earlier in this opinion, the prosecution built a theory of relevance centered upon the supposed similarity between the 2002 incident and the charged offense to rebut defendant's claims of self-defense and defense of others. Consequently, to prove sufficient similarity, the prosecution must show "striking similarity" between the other act and the charged offense. *VanderVliet*, 444 Mich at 67 ("If we ask, does [the] misconduct have to exhibit striking similarity with the misconduct being investigated, the answer is, only if similarity is relied on.") (quotation marks and citation omitted; alteration in original); see also *Mardlin*, 487 Mich at 620 ("The acts or

18

events need not bear striking similarity to the offense charged if the theory of relevance does not itself center on similarity."). The prosecution has failed to show such similarity.

The 2002 incident and the charged offense bore notable differences. See *Knox*, 469 Mich at 509-513; *Crawford*, 458 Mich at 395-397. The 2002 incident involved a completely different situation and a victim who was completely unrelated to the charged offense. The 2002 incident consisted of a seemingly calculated attack to recover a drug debt, whereas the instant offense involved an allegedly spontaneous reaction by defendant after he witnessed his daughter and Woodward in a state of partial undress. The 2002 incident did not involve a claim of self-defense or defense of others, while the current case clearly does.

Indeed, the only similarity between these two incidents is that both were assaults allegedly committed by defendant. Rather than being sufficiently similar and providing a proper noncharacter purpose for admission into evidence, the 2002 incident served solely to demonstrate defendant's propensity for violence. As in *Sanders*, because defendant in this case admitted to using nondeadly force against Woodward, the only issue was whether he used such force in justifiable defense of himself or others. See *Sanders*, 964 F2d at 298. The fact that defendant had previously assaulted a completely different individual in a completely different scenario years earlier had no probative force other than to show that defendant was the "kind of person" who would assault someone. See *Crawford*, 458 Mich at 397; *Knox*, 469 Mich at 512-513; *Sanders*, 964 F2d at 298-299.[11]

---

[11] In addition to the lack of similarity, we note that the other act in this case was remote in time, occurring approximately 10 years before the charged offense, which further limits its logical relevance. See *People v Yost*, 278 Mich App 341, 405; 749 NW2d 753 (2008)

19

In other words, the other-acts evidence created a chain of inferences dependent on the preliminary conclusion that defendant had violent tendencies and acted consistently with those tendencies in attacking Woodward. See *Commanche*, 577 F3d at 1269. This is exactly the kind of propensity evidence that MRE 404(b) prohibits. See *Sanders*, 964 F2d at 298-299. Given the insufficient similarity between the 2002 incident and the charged offense, the prosecution has failed to establish "some intermediate inference, other than the improper inference of character, which in turn is probative of the ultimate issues in this case." *Crawford*, 458 Mich at 391. As a result, we hold that the other-acts evidence was inadmissible.

In sum, the circumstances of the prior conviction did not bear a striking similarity to those of the charged offense. Instead, the prosecution relied on the impermissible inference that defendant had committed the charged offense because of his supposed violent character. Therefore, although the prosecution nominally recited what could be a proper purpose under the first prong of the *VanderVliet* test, evaluation of the probative value of the other-acts evidence under the second prong of the *VanderVliet* test reveals that no such purpose actually existed in this case; rather, evidence of the 2002 incident constituted mere character evidence "masquerading" as evidence intended to rebut defendant's claims of self-defense and defense of others. See *Crawford*, 458 Mich at 397.

("Although there is no time limit applicable to the admissibility of other acts evidence, see MRE 404(b), the remoteness in time between the charged conduct and the more serious allegations of physical abuse limits the logical relevance of these other acts . . . .").

The lower courts in this case failed to properly examine the purpose and probative value of the 2002 incident and therefore failed to recognize the impropriety of this evidence. The trial court entirely failed to analyze the probative value of the 2002 incident.[12] In turn, the Court of Appeals summarily concluded that the other-acts evidence had "significant probative value concerning a specialized matter in dispute: defendant's self-defense claim." *Denson*, unpub op at 5. In doing so, the Court of Appeals succumbed to the "common pitfall" of condoning other-acts evidence simply because the prosecution managed to recite a potentially proper purpose. *Crawford*, 458 Mich at 387. By failing to "weed out character evidence that is disguised as something else," and by failing to closely scrutinize the probative value of the proffered act, the lower courts permitted the admission of improper other-acts evidence and thus erred under MRE 404(b). *Id*. at 388.[13]

---

[12] In fact, the trial court inexplicably fueled misuse of the other-acts evidence. In response to a statement by the prosecutor that the evidence was "just an example of Mr. Denson losing control and using excessive force against an individual," the trial court ruled that the prosecution could use the evidence as part of "an argument that [defendant] has some kind of temper or that he has bad judgment or something like that." This ruling blatantly encouraged the use of an improper propensity inference, which runs squarely counter to the fundamental principle that other-acts evidence is inadmissible for propensity purposes. *Sabin*, 463 Mich at 56; *Crawford*, 458 Mich at 383.

[13] In this case, because we conclude that the other-acts evidence was inadmissible in that it was not logically relevant to a permissible purpose, it is unnecessary to discuss unfair prejudice, the third prong of the *VanderVliet* test, or any limiting instruction, the fourth prong of the *VanderVliet* test. See *VanderVliet*, 444 Mich at 55.

## IV. HARMLESS ERROR

Although we find error in the admission of the other-acts evidence under MRE 404(b), we apply harmless-error review; a preserved nonconstitutional error "is presumed not to be a ground for reversal unless it affirmatively appears that, more probably than not, it was outcome determinative—i.e., that it undermined the reliability of the verdict." *Douglas*, 496 Mich at 565-566 (quotation marks and citations omitted); *Lukity*, 460 Mich at 495-496. We "focus[] on the nature of the error and assess[] its effect in light of the weight and strength of the untainted evidence." *Lukity*, 460 Mich at 495 (quotation marks and citation omitted). In this case, we find that the error was not harmless and, consequently, that defendant's conviction must be reversed.

We have noted that other-acts evidence carries with it a high risk of confusion and misuse. *Crawford*, 458 Mich at 398. When a "defendant's subjective character [is used] as proof of conduct on a particular occasion, there is a substantial danger that the jury will overestimate the probative value of the evidence." *People v Engelman*, 434 Mich 204, 213 n 16; 453 NW2d 656 (1990), quoting Imwinkelried, Uncharged Misconduct Evidence, § 2:18, pp 48-49. The risk is severe that the jury "will use the evidence precisely for the purpose that it may not be considered, that is, as suggesting that the defendant is a bad person, a convicted criminal, and that if he 'did it before he probably did it again.' " *Crawford*, 458 Mich at 398. And in *Commanche*, the Tenth Circuit emphasized the dangerous potential of admitting improper other-acts evidence in a self-defense case:

> [O]ther crimes evidence is strong medicine for juries. Even if not argued at closing, when faced with the single disputed issue in the case—self defense—the jury could not escape[] the clear articulation that Commanche

22

was a violent and aggressive person who was merely repeating that tendency. [*Commanche*, 577 F3d at 1269-1270 (citation omitted).]

In this case, defendant and Woodward testified to highly conflicting accounts of the same incident, but the introduction of the inadmissible evidence tipped the scales, buoying Woodward's credibility while helping to sink defendant's. See *Sanders*, 964 F2d at 299; *Knox*, 469 Mich at 513. To prove the elements of the charged offense, and to rebut defendant's claims of self-defense and defense of others, the prosecution needed the jury to believe Woodward's testimony that defendant had suddenly and viciously attacked him without justification. To this end, the prosecution introduced evidence of the 2002 incident, the only purpose of which was to convince the jury that defendant was an aggressive and violent man and that Woodward was simply another victim of defendant's violent tendencies. After asking defendant about the 2002 incident, the prosecutor immediately accused defendant of having a bad temper and beating Woodward to release his pent-up rage. In questioning DD, the prosecutor presented defendant's past anger issues as a well-known chapter of "family history" and a character flaw that explained why defendant would "lose control" with Bush, DD, and Woodward. The prosecutor asked Rosemary Denson if defendant's trouble with Bush caused her to fear defendant, implying that defendant's temper was indiscriminate. And, in the middle of questioning DD's sexual assault counselor about the purpose of her consultation with DD, the prosecutor raised the entirely unrelated issue of whether she knew of defendant's previous assaultive conduct in Detroit. These questions evoked the very propensity inference that MRE 404(b) forbids. This was all painted in bare contrast to the prosecutor's presentation of Woodward as a "nice boy" and a "good guy." Such use of

23

the impermissible propensity inference prohibited by MRE 404(b), which the prosecution repeatedly made to the jury, convinces us that the jury "could not escape[]" the impermissible inference invited by this evidence and that the prejudice defendant suffered as a result was severe enough to entitle him to relief.[14] *Commanche*, 577 F3d at 1270; see also *Crawford*, 458 Mich at 398-399; *Engelman*; 434 Mich at 213 n 16.

The prosecution further compounded the problem in its closing remarks to the jury. Addressing defendant directly, the prosecutor argued that there was no reasonable doubt that defendant did not act in "defense of anybody" because defendant was a "bully" and a "coward" who lost control with Woodward, just as he had lost control with Bush. Thus, it was "not a coincidence" that "this guy pounded on [Woodward]." Because there was no viable self-defense claim in the 2002 incident, asserted the prosecutor, there could be no viable self-defense claim here.

In sum, the prosecution used the other-acts evidence at trial to engineer an argument that the 2002 assault demonstrated that defendant was a violent person in general, which thereby proved that defendant assaulted Woodward without justification in 2012. The message sent to the jury by this evidence was as clear as it was improper, and its "reverberating clang" could not be unheard. *Crawford*, 458 Mich at 399 (quotation marks omitted). The prosecution also paraded this evidence in front of the jury in a manner that encouraged the jury to draw the forbidden propensity inference,

---

[14] Although not necessary to this conclusion, we note that the effectiveness of the prosecution's propensity-based trial strategy and the prejudice it caused are well illustrated by one juror's request that the court ask a police witness, "[D]o you think Mr. Denson is a violent person, or can be a violent person or have a bad temper[?]"

repetition which further enhanced the danger of unfair prejudice arising from admission of the other-acts evidence. See *Crawford*, 458 Mich at 400 n 17.

Although the prosecution also introduced photographs and medical testimony regarding Woodward's injuries, the mere presence of some corroborating evidence does not automatically render an error harmless. Otherwise, our directive to assess the effect of the error "in light of the weight and strength of the untainted evidence" would have no meaning. See *Crawford*, 458 Mich at 399-400. In this case, defendant's version of events was not wholly inconsistent with the injuries Woodward sustained. On these facts, we believe the improper admission of the other-acts evidence undermined the reliability of the verdict by making it more probable than not that, had this evidence not been admitted, the result of the proceedings would have been different. *Lukity*, 460 Mich at 495-496. The error, therefore, was not harmless.[15]

---

[15] We note that whether admission of other-acts evidence is harmless is a case-specific inquiry; the effect of an error should be determined by the particularities of an individual case. See *Crawford*, 458 Mich at 399-400 ("The prejudice inquiry 'focuses on the nature of the error and assesses its effect in light of the weight and strength of the untainted evidence.' ") (citation omitted). In this case, the lack of any 404(b)-permissible probative value combined with the repeated misuse of the evidence makes our decision a relatively straightforward one.

We are not convinced by the dissent's urgings to the contrary. The dissent admits that the prosecution's other-acts evidence was used to show that defendant "employed unjustified and excessive force when faced with situations involving conflict and confrontation." Yet the dissent attempts to minimize the impact of this impermissible evidence by trying to separate it from what the dissent considers the core of the case: "whether the attempted rape actually occurred, or whether the rape claim was concocted after the fact." To the contrary, we believe the improper other-acts evidence influenced this core issue in one of the most problematic manners—it rendered the issue immaterial. If the impermissible evidence caused the jury to believe that defendant was indeed the type of person who used "unjustified and excessive" force in confrontational situations, then whether a sexual assault actually occurred would be inconsequential to resolution of

## V. CONCLUSION

We hold that the admission of evidence related to the 2002 incident was erroneous because the evidence was not logically relevant to a proper noncharacter purpose under MRE 404(b). We also hold that this error was not harmless. Therefore, we reverse the judgment of the Court of Appeals and remand this case to the trial court for a new trial.

Richard H. Bernstein
Stephen J. Markman
Brian K. Zahra
Bridget M. McCormack
David F. Viviano
Joan L. Larsen

---

the case. The altercation between Woodward and defendant was undoubtedly a confrontational situation, and the impermissible evidence encouraged the jury to conclude that defendant acted as he previously had in confrontational situations—with unjustified and excessive force—that is, he took actions that by definition cannot support a claim of self-defense or defense of others. Said differently, due to the improper other-acts evidence and the propensity inference it invited, the jury had no need to decide what the dissent labels "the issue that the jury was called on to decide at trial . . . ."

The dissent also seeks to diminish the harm inflicted by the erroneously admitted evidence by emphasizing defendant's post-altercation behavior and the post-altercation behavior of several defense witnesses. In the dissent's view, this post-altercation behavior demonstrates defendant's guilt. But the dissent errs by concluding that the evidence it identifies invariably supports the prosecution's theory of the case. The jury could reasonably have found the evidence to be consistent with defendant's version of events as well. Moreover, the dissent fails to fully consider the nature of the error in this case. As detailed earlier in this opinion, the other-acts evidence in this case had no probative value beyond the propensity inference forbidden by MRE 404(b), and the evidence created a high risk of prejudice to defendant. Further, the prosecutor referred to the evidence throughout the trial to paint defendant as a violent person. Focusing on the nature of the error and assessing its effect in light of the weight and strength of the untainted evidence, we cannot agree with the dissent that the evidentiary error was harmless. See *Crawford*, 458 Mich at 399-400.

26

STATE OF MICHIGAN

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

       Plaintiff-Appellee,

v                                   No. 152916

TMANDO ALLEN DENSON,

       Defendant-Appellant.

_____

WILDER, J. (*dissenting*).

I respectfully dissent from the majority opinion. Assuming arguendo that evidence of defendant's prior act was improperly admitted pursuant to MRE 404(b), the error does not require reversal because, "after an examination of the entire cause," MCL 769.26, it does not affirmatively appear that it is more probable than not that the error was outcome determinative. *People v Lukity*, 460 Mich 484, 495-496; 596 NW2d 607 (1999). Because defendant has not shown that it is more likely than not that he would have been acquitted if the evidence had been excluded, I would simply deny leave to appeal, leaving intact defendant's conviction.

The prosecution and the defense agreed on a few common facts. Defendant's 15-year-old daughter was alone in her bedroom with her boyfriend, Shamark Woodward, in the early evening hours of October 22, 2012. Under either version of events, the couple was in varying stages of undress when defendant appeared in his daughter's bedroom and inflicted serious injuries upon Woodward. There was no question regarding whether defendant committed the assault on Woodward—the only serious point of contention was

whether the assault was legally justified. As a general matter, a defendant who asserts the affirmative defense of self-defense "admits the crime but seeks to excuse or justify its commission." *People v Dupree*, 486 Mich 693, 704 n 11; 788 NW2d 399 (2010).

The theory proffered by the defense was that defendant possessed an honest and reasonable belief that his daughter was being sexually assaulted by Woodward, and defendant used the force necessary to prevent an imminent forcible sexual penetration, as well as to protect himself from Woodward. The prosecution, on the other hand, sought to establish that defendant's claim of attempted rape was wholly fictional, concocted by defendant after the assault had occurred in order to escape criminal responsibility for the savage beating of Woodward.

In my opinion, the extent and nature of Woodward's injuries are wholly inconsistent with any claim of self-defense. With the exception of the bruising and swelling Woodward suffered as a result of being punched and kicked in the face by defendant, none of the victim's injuries was on the front of his body. All of the victim's serious injuries, requiring 21 sutures and 8 staples to close, were located on the back and side of his body. Moreover, the actions of defendant and his family after the incident were inconsistent with any claim that defendant possessed an honest and reasonable belief that his daughter was the victim of an imminent sexual assault by Woodward. Simply put, more than ample evidence existed for the jury to conclude that defendant's claim of attempted rape was fabricated.

According to defendant's testimony, after hearing "the holler, the scream" of his daughter, defendant ran up the stairs and saw Woodward, who was naked from the waist down, with his hand "in [his daughter's] pants." Believing he was encountering the

imminent rape of his daughter, defendant screamed and began hitting Woodward, who immediately jumped up and began fighting back. After a bit of fisticuffs, Woodward ran downstairs with defendant in pursuit, and Woodward threw a glass at defendant. After Woodward purportedly ran back upstairs, defendant testified that Woodward "threw his hands in the air" and apologized for being "stupid." Defendant testified that he returned Woodward's clothing and permitted him to leave the residence. Only when pressed during cross-examination did defendant acknowledge that he broke a lamp over Woodward's head and that he "probably" kicked and stomped Woodward, but defendant could not recall with "what all" he beat Woodward. Defendant further acknowledged that he "probably" inflicted the knife wounds on Woodward's back, but did not know how the lacerations occurred. Indeed, defendant testified that he did not "believe" the lacerations "happened" until he was shown pictures. In contrast, Woodward testified that the several knife wounds to his back and shoulders were inflicted by defendant while Woodward was sitting in the corner "in the fetal position."

Defendant did not call the police to have Woodward arrested for the attempted rape of his daughter. Rather, defendant testified that he used his cell phone to call his sister prior to Woodward leaving the residence. Defendant testified that his daughter was "crying so hard that we couldn't communicate[.]" At that point, defendant and his sister left the residence, leaving behind his weeping daughter as well as his 10- and 11-year-old sons. Defendant claimed that he made two telephone calls to "a law enforcement officer" (his parole officer), followed by a trip to the police department to file a police report, only to discover that the police department was closed. Rather than return to his residence to provide comfort and support to his traumatized daughter, defendant testified that he went

3

to his sister's house and had an "anxiety attack." Defendant returned to the residence on the following day, October 23, 2012. Later that day, defendant went to the home of "a couple of buddies . . . computer geeks" who assisted defendant in drawing up a notarized document entitled "Affidavit and Statement of Facts: PRESUMPTION REGARDING SELF-DEFENSE."

Defendant acknowledged that it had "crossed [his] mind" that he might get in trouble as a result of the incident. When asked why he left his children home alone after the alleged attempted sexual assault, defendant testified:

> Um, we went directly--like I said, we went to the police department and I made the phone calls. I came home early in the morning, but my wife was there, I'm sorry. Um, my wife got home shortly after midnight. And that's, you know, I went to the police department. And then I ended up at my sister's house, and um, I was on the phone with my wife too, in and out throughout the, you know. And I went home as soon as I could walk, as soon as I could get up and walk. And that was like 6:30 or 7:00 o'clock in the morning. And I was there. I didn't anticipate leaving (inaudible) I let 'em. You know I go to work and I come home. My daughter's--you know, but she wasn't. That's the answer.

Likewise, defendant acknowledged that he called his parole officer rather than emergency services. When asked why he did not simply call 911 to report the crime, which would have permitted him to remain at the residence with his distraught daughter, defendant provided an explanation that indicated both that he did and did not call 911:

> 911 doesn't come when we call. When we call 911, they do not come, unless someone is dead. Do you know what the 911 operator told me, is the person dead? I said no, he's no longer there. And she said, well wait 'til tomorrow, someone will be there when shift changes.

4

In contrast, defendant admitted to his parole officer that he made no attempt to contact the police on the night of the incident because "he did not want to have police contact." This same admission was contained in defendant's own notarized affidavit.

Rosemary Denson, defendant's wife, testified that she arrived home from work around 1:00 a.m. on October 23, 2012. She testified that her children were home and that defendant had "left with his sister." After talking to defendant, who indicated that he was going to go to the police station, Mrs. Denson telephoned the Flint Police Department and was instructed to call 911. Mrs. Denson testified that she called 911 and reported the crime to Operator 70, who told her that "someone would be out that day" to talk to her and her daughter. In reality, the 911 records keeper testified that the dates and times of 911 calls are computer generated and that the very first phone call regarding an alleged sexual assault came from Mrs. Denson on October 24, 2012, at 4:00 a.m., approximately 30 hours after the alleged sexual assault occurred and approximately 5 hours before defendant was arrested in the office of his parole officer. In the 911 call, which was played for the jury, Mrs. Denson claimed that the assault took place "last night" while she was at work and that she was "told [about it] this morning."

Defendant's daughter testified that she was alone in her bedroom with Shamark Woodward. Woodward kissed her, pushed her down on the mattress, held her arm down and pulled her jogging pants "halfway down" before defendant pulled Woodward off her and Woodward and defendant began "hitting and pushing." Despite acknowledging that she was present in her bedroom the entire time, defendant's daughter denied ever seeing her father kicking Woodward in the face, beating Woodward with a shoe, or wielding a knife. She testified that she did not "know" whether defendant stomped and kicked

5

Woodward or whether her father smashed a lamp over his head. Indeed, defendant's daughter claimed that she simply "didn't pay attention to" the lamp. She also denied seeing "any cuts" on Woodward, claimed that there "wasn't no blood" on Woodward, and stated that she did not hear "any conversation" between defendant and Woodward. However, the day after the assault, defendant's daughter initiated a messaging conversation with Woodward on social media, seeking Woodward's forgiveness for "dragging [him] into this," telling him that she loved him, and indicating that she needed to hear his voice. Upon learning that defendant retained possession of Woodward's phone, defendant's daughter responded that she thought Woodward was "just ignoring [her] calls." She inquired whether Woodward could call her from someone else's telephone because if she heard his voice she would "feel better."

Upon review of the entire record, the 404(b) evidence admitted in this case was admitted to show that defendant employed unjustified and excessive force when faced with situations involving conflict and confrontation, in order to counter defendant's claim of self-defense. In actuality, however, the evidence had very little to do with the issue that the jury was called on to decide at trial—whether the attempted rape actually occurred, or whether the rape claim was concocted after the fact. Clearly, the jury opted to believe that the rape claim was fictional, and that defendant committed the crime of assault with intent to do great bodily harm less than murder (AWIGBH), MCL 750.84, because Woodward was caught *in flagrante delicto* with defendant's daughter. However, if a defendant is found to act with the intent to do serious injury of an aggravated nature—the requisite intent for AWIGBH—the fact that he was provoked or acted in the heat of passion is irrelevant. *People v Stevens*, 306 Mich App 620, 628-629; 858 NW2d

6

98 (2014); *People v Mitchell*, 149 Mich App 36, 39; 385 NW2d 717 (1986). Such is the situation in this case. At sentencing, the judge noted that some parents would "respond forcefully" "if they found their fifteen year old daughter in bed with a young man." However, the trial judge also noted that defendant's use of a knife to slash Woodward— to inflict serious injury of an aggravated nature—was beyond the pale:

> And that's the difference. The knife is the difference. And I think that's why the jury convicted you. And that's [why] you have to take this penalty. There's a lot of people that would understand why you started doing what you did but they don't understand why you finished doing what you did.

Just as the trial judge specifically linked the defendant's use of a knife to the sentence the trial court imposed, so too must we recognize that the jury had the same evidence before it and considered this same over-the-top conduct when rejecting defendant's self-defense claim.[1] "An appellate court must remember that the jury is the sole judge of the facts. It is the function of the jury alone to listen to testimony, weigh the evidence and decide the questions of fact. . . . Juries, not appellate courts, see and hear witnesses and are in a much better position to decide the weight and credibility to be given to their testimony." *People v Hardiman*, 466 Mich 417, 431; 646 NW2d 158 (2002) (quotation marks,

---

[1] It is for this reason that *United States v Commanche*, 577 F3d 1261, 1266-1269 (CA 10, 2009), is inapposite. *Commanche* held that the other-acts evidence was inadmissible because the evidence could not show that the defendant's self-defense theory was invalid *unless* the jury impermissibly inferred that he acted in conformity with a violent predisposition. In this case, consideration of the other-acts evidence was not required for the jury to invalidate defendant's claim of self-defense—the 21 sutures and 8 staples spoke for themselves.

citation, and brackets omitted).  Because defendant has not shown that he would more likely than not have been acquitted if the evidence had been excluded, I respectfully dissent from the majority opinion and would deny leave to appeal.

Kurtis T. Wilder